# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br>　　　　　　Plaintiff,<br><br>vs.<br><br><br>STEPHEN LAMAR SWANN, JR.,<br>　　　　　Defendant. | Case No. 25-cr-1043-CJW<br><br>**REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS** |

_____

## I.     INTRODUCTION

On October 22, 2025, the Grand Jury returned an Indictment charging Defendant with one count of Conspiracy to Distribute a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1), 841(b)(1)(B), and 846, one count of Distribution of a Controlled Substance in violation of 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C), and one count of Aiding and Abetting the Possession with Intent to Distribute a Controlled Substance in violation of 18 U.S.C. Section 2 and 21 U.S.C. Sections 841(a)(1) and 841(b)(1)(C).  (Doc. 4.)

The matter before me is Defendant's motion to suppress.  (Doc. 34.)  Defendant seeks to suppress: all evidence seized from the search of Defendant's University Avenue residence on June 25, 2025 (*see* inventory at Ex. B, pgs. 19-13), two blue iPhones, and any evidence derived from the iPhones.  (*Id.*)  The Government filed a timely Response. (Doc. 38.)  In the response, the Government states that it "does not intend on admitting evidence obtained from Defendant's iPhones, so it does not resist [D]efendant's motion to suppress the evidence" and the "Court should grant [D]efendant's motion to suppress evidence obtained from [D]efendant's iPhones as the government does not resist because it does not intend on admitting any of that evidence during its case-in-chief."  (*Id.* at 10.)

The Government reiterated this position at the hearing, noting that it could not get into one of the iPhones and the other iPhone did not contain anything helpful to the Government's case. The Honorable C.J. Williams, Chief United States District Court Judge, referred the motion to me for a Report and Recommendation. I held a hearing on Defendant's motion to suppress on January 7, 2026. (Doc. 42.)

At the hearing, the Government did not offer any exhibits or call any witnesses; however, the following Defendant's Exhibits were admitted without objection:

A. Case Supplemental Report from Investigator Chad Leitzen;

B. Seach Warrant dated June 25, 2025; and

C. Case Supplemental Report from Officer Brian Wullweber.

Defendant's Exhibit E, information about Defendant's legitimate contacts in Chicago, was also admitted over objection by the Government.

For the following reasons, I respectfully recommend that the District Court **deny** Defendant's Motion to Suppress.

## II. FINDINGS OF FACT

In the absence of testimony and due to the nature of the parties' arguments, I will turn to the June 25, 2025 Search Warrant Application for the University Avenue residence for a statement of the facts.

In the Search Warrant Application Affidavit, Investigator Chad Leitzen[1] set forth the following information:

1. Over the course of the past several years the Dubuque Drug Task Force (DDTF) has received information from several different sources advising that [Defendant] and some of his associates are heavily involved in selling drugs, specifically cocaine and marijuana in Dubuque. Some of the tips also stated that Swann or his associates are in possession of firearms.

---

[1] Inv. Leitzen is employed by the Dubuque Police Department and is currently assigned to the Dubuque Drug Task Force. (Doc. 34-3 at 5; Def. Ex. B.)

2

2. During the early part of June 2025, I, Inv. Leitzen received a tip from a subject who wished to remain anonymous due to fear of retaliation. The anonymous tipster hereinafter referred to as confidential source (CS) stated that [Defendant] is living with [H.B.] and her very young children at [a residence on] University Avenue, Dubuque, Iowa. . . . CS stated [Defendant] drives [H.B.'s] white Honda Pilot. CS knew the license plate number to be [XXX XXX], which comes back to a white 2015 Honda Pilot registered to [H.B.] . . . of [XXXX] University Avenue, Dubuque, Iowa. . . . CS stated [Defendant] is a major distributor of cocaine, marijuana, Xanax pills, and fentanyl pills in Dubuque which he brings to Dubuque from out of town. CS stated [H.B.] is also involved in helping [Defendant] sell the drugs. CS stated [Defendant] is also in possession of a handgun.

3. In the middle of June 2025 confidential informant #1152 (hereinafter referred to as CI) stated that CI buys a large quantity of cocaine on a regular basis from a subject CI knows as Jordan Hefel[2] who lives in Galena, IL. CI stated Hefel is the middleman for the drug deal. CI stated CI contacts Hefel and asks for the cocaine. Hefel then contacts his drug supplier and sets up the drug deal. Usually within a relatively short period of time, CI, Hefel, and the drug supplier all meet in a public place within the city limits of Dubuque during the daytime hours for the drug deal to take place. CI stated each of them arrive in separate vehicles. CI stated Hefel retrieves the cocaine from the drug supplier and brings it to CI. Hefel takes a small portion of the cocaine as his payment for orchestrating the drug deal. CI gives Hefel the money for the cocaine which Hefel then gives to the drug supplier. They then part ways. CI stated that same scenario has played out several times over the course of about the past six months.

4. During the middle of June 2025,[3] CI, working at the direction of the DDTF, set up a drug deal with Hefel requesting cocaine. Hefel set it up with his drug supplier and they agreed to meet in a public location in

---

[2] I have not anonymized the record regarding Co-Defendant Hefel.

[3] While the warrant application does not specify the date of this controlled purchase (also called an "undercover operation"), Inv. Leitzen's report describes the events as occurring on June 19, 2025. (Def. Ex. C at 3.)

3

Dubuque. The DDTF set up surveillance at the public location during the undercover operation. CI arrived and parked in the parking lot. A short time later, Hefel arrived and parked in the parking lot. He exited his vehicle and began looking around as if he were looking for someone. A short time later, the aforementioned white 2015 Honda Pilot bearing Iowa license plates [XXX XXX] (hereinafter referred to as target vehicle) arrived and parked next to Hefel's vehicle. A white female was driving the target vehicle and a black male was sitting in the passenger seat. I observed the black male and was able to positively identify him as [Defendant].

5. During the undercover operation, [Defendant] exited the target vehicle and met with Hefel for a short time. [Defendant] then reached into the target vehicle and retrieved an item. He handed that item to Hefel. Hefel immediately walked to CI's vehicle and handed that item to CI. That item was a plastic bag containing cocaine. CI handed Hefel the money that was agreed upon for the undercover purchase. Hefel was then observed walking back to the target vehicle and handing [Defendant] the undercover buy money. The target vehicle left a short time later.

6. DDTF surveillance units followed the target vehicle after the undercover purchase. The target vehicle went to a store for a few minutes then returned directly to [the] University Avenue [residence]. [Defendant] was observed walking in the front door of [the] University Ave. [residence] at which time surveillance was ended.

7. Although CI did not see Hefel's drug supplier on the day of the undercover purchase, CI stated CI has seen him before. CI stated CI would certainly be able to recognize him if CI were to see him again. CI described the drug supplier as a short light-skinned black male with short hair who is in his late 20s or early 30s. Following the undercover operation, I showed CI a photo lineup containing photos of six different subjects resembling [Defendant's] general physical description. CI viewed the photo lineup and was able to positively identify [Defendant] from the photo lineup as being Hefel's drug supplier.

8. The day following the undercover purchase, DDTF investigators reviewed City of Dubuque traffic cameras and located a camera that faces toward [XXXX] University Ave. Although the traffic camera does not show the front of the residence, it does show the end of the parking lot where the target vehicle is normally parked. During the timeframe of the undercover operation the day before, the target vehicle was observed backing out of the parking lot at [XXXX] University Ave. A short time later, it arrived at the agreed-upon meeting location.

9. As part of the investigation into [Defendant], I entered license plate number [XXX XXX] into Flock and learned that it left Dubuque on June 19, 2025 at 6:47 am. It passed an automated license plate reader (ALPR) in the Chicago, IL area at 10:35 am and was back in Dubuque at 2:20 pm. I know that the ALPR in the Chicago area that the target vehicle passed is approximately three hours and fifteen minutes from Dubuque. Based on the timing and locations provided by Flock, the target vehicle could not have spent much more than an hour in the Chicago area before returning to Dubuque.

10. In a further review of Flock, I noticed that the target vehicle made a trip toward the Chicago area on June 13th and returned to Dubuque seven hours and ten minutes later. Although the only ALPRs that the target vehicle passed on that trip in Illinois were in the Rockford, IL area it is believed that the vehicle likely went to Chicago and just did not pass a location with an ALPR. The trip before that was June 6th where the vehicle was gone for less than six hours. The trip before that was May 28th.

11. On June 20 2025, based on the information listed above, I applied for and was granted a search warrant allowing officer to affix a GPS mobile tracking device to the target vehicle to monitor its movements. That GPS mobile tracking device was affixed to the target vehicle on June 21, 2025 during the early morning hours.

12. On June 25 2025, at approximately 6:03 am, the target vehicle left Dubuque headed toward Chicago, IL. A female subject positively identified by photograph as [H.B.] was observed to be driving the vehicle. She drove to directly to the area of Posen, IL just south of

5

Chicago, IL. She arrived at that location at approximately 9:51 am. At approximately 10:20 am, the vehicle began heading back toward Dubuque.

13. I know, based on my training and experience as well as conversations I have had with other law enforcement officers, that short-term trips to source cities are indicative of someone making that trip for the purpose of acquiring drugs. I know that it is extremely uncommon for someone to make a six and one half hour round trip in a vehicle for a social visit which lasts less than thirty minutes. I believe the likelihood that [H.B.] acquired a large quantity of drugs in Chicago to transport back to Dubuque for resale is very high.

14. Based on my training and experience, I know that subjects who are involved in the distribution of drugs often acquire the drugs in bulk amounts for a relatively cheap price. Those subjects then break the bulk quantities of drugs down into smaller personal use amounts which are then sold to drug users for a profit.

15. I am also aware that drug dealers often keep bulk quantities of drugs at their residence. The drug dealers often meet drug customers at a location away from their residence in order to sell them a small quantity of drugs for a profit. Drug dealers typically only bring a relatively small quantity of drugs from their residence to the meeting location to help protect them from having the drugs being stolen by drug users or rival drug dealers. It also helps protect the drug dealers from being captured by law enforcement and having all of their drugs seized.

16. Based on the facts gathered during this investigation, I believe there will likely be cocaine, marijuana, drug paraphernalia, packaging material, firearms, and possibly other drugs inside the residence of . . . University Avenue. . . . I also believe [Defendant] will likely be in possession of a firearm and/or ammunition inside of that residence.

17. I know, based on my training and experience, that it is illegal for a convicted felon to be in possession of a firearm ammunition and/or explosive devices. I know, based on this investigation, that [Defendant] has been convicted of several felony-level offenses including controlled

6

substance violations, burglary, possession of a weapon, armed robbery/no firearm, aggravated unlawful use of a weapon/vehicle, and delivery of marijuana.

18. The Dubuque Drug Task Force respectfully requests permission to search the residence of [XXXX] University Avenue . . . for any of the items sought with this search warrant application.

19. The Dubuque Drug Task Force respectfully requests permission to search the person of [Defendant] for any of the items sought with this search warrant application.

(Def. Ex. B.) In the Search Warrant Application, the following property was identified to be seized:

1. Any and all controlled substances which are possessed in violation of Chapter 124.401 State Code of Iowa.

2. Any and all drug paraphernalia consisting in part of and including but not limited to: Straws, mirrors, hypodermic syringes, razor blades, cotton, spoons, aluminum foil, cutting agents, scales, and any other material associated with the processing and packaging of illicit drug sales and/or use; any and all documents that may relate to illicit drug sales and trafficking; [and] any money or other proceeds that may have come from drug trafficking.

3. Any and all open, closed, locked and unlocked containers, packages, and/or safes which are capable of concealing any of the items sought with this search warrant application.

4. Any and all books, records, receipts, notes, ledgers, and other papers relating to the transportation, ordering, purchase, or distribution of controlled substances.

5. Any and all firearms ammunition and or explosive devices.

(*Id.*)

7

Defendant's Exhibit E tends to show that H.B. made a trip to a Schaumburg, Illinois in a white SUV to deliver Defendant's son to the child's mother. The remainder of Exhibit E tends to show Defendant's legitimate contacts with the Chicago area, to wit: his family has interest in parcel of real property there and connection to Midwest Tint Academy.

## III.  DISCUSSION

### A.  The Parties' Arguments

Defendant argues that the search warrant application for the University Avenue residence lacks probable cause. Specifically, Defendant argues that the search warrant application "fails to explain why police believed that there might be any evidence there." (Doc. 34-1 at 7.) Defendant points out that Inv. Leitzen's affidavit "does not allege that any drug deals took place at the residence, nor does it provide any information from sources that anyone was keeping drugs at the residence." (*Id.*) Defendant also argues that the *Leon* good faith exception does not apply in this matter. Defendant maintains that because the affidavit failed to explain "with any specificity why evidence of drug dealing might be found at" the University Avenue residence, the issuing judge "abandoned the judicial role and authorized a warrant on which no reasonable officer could rely." (*Id.* at 13.) Defendant also suggests that the search warrant application is so lacking in indicia of probable cause that belief in the existence of probable cause is unreasonable. (*Id.* at 12.) Further, Defendant suggests that by failing to particularize the place to be searched or the thing to be seized, the search warrant is facially deficient, and a reasonable officer would not presume the warrant to be valid. (*Id.* at 12-13.)[4]

---

[4] I read Defendant's particularity argument to apply almost entirely to the seizure and search of the iPhones which is now moot. At page 12-13 of his brief, is Defendant's only discussion about "particularity" regarding his residence; however, this simply repeats the argument that the application lacks specificity about why evidence might be found there.

8

The Government argues that the search warrant for the University Avenue residence was supported by probable cause. (Doc. 38 at 5.) The Government maintains that based on the totality of the circumstances outlined in Inv. Leitzen's affidavit, there were "sufficient facts to establish a fair probability that contraband would be discovered in [ ] the residence." (*Id.* at 7.) Alternatively, the Government argues that the *Leon* good faith exception is applicable. (*Id.* at 8.)

## B.    *Relevant Law*

"The Warrant Clause of the Fourth Amendment requires that warrants (1) be issued by a neutral and detached magistrate, (2) contain a 'particular[ ] descri[ption of] the place to be searched, and the persons or things to be seized,' and (3) be based 'upon probable cause, supported by Oath or affirmation.'" *United States v. Skarda*, 845 F.3d 370, 375 (8th Cir. 2016) (quoting *United States v. Clyburn*, 24 F.3d 613, 617 (4th Cir. 1994), in turn quoting U.S. Const. amend. IV). "A magistrate judge may issue a search warrant 'upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place.'" *Skarda*, 845 F.3d at 376 (quoting *Steagald v. United States*, 451 U.S. 204, 213, 101 S.Ct. 1642, 68 L.Ed.2d 38 (1981)). "Probable cause exists when, viewing the totality of the circumstances, 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Reed*, 921 F.3d 751, 757 (8th Cir. 2019) (quoting *Illinois v. Gates*, 462 U.S. 213, 230, 238 (1983)); *see also United States v. Evans*, 4 F.4th 633, 636 (8th Cir. 2021) ("Probable cause is a fair probability that . . . evidence of a crime will be found in the location to be searched") (quoting *United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996))). "In assessing whether a warrant is sufficiently particular, [courts] consider the purpose for which the warrant was issued, the nature of the items to which it is directed, and the total circumstances surrounding the case." *United States v. Ivey*, 91 F.4th 915, 918 (8th Cir. 2024) (citation omitted). The particularity requirement "is one of 'practical accuracy

rather than a hypertechnical one.'" *Id.* (quoting *United States v. Schave*, 55 F.4th 671, 675 (8th Cir. 2022)). "Common sense" drives the inquiry into whether probable cause exists, and the ultimate determination cannot be "readily, or even usefully, reduced to a neat set of legal rules." *Illinois v. Gates*, 462 U.S. 213, 231-32 (1983). "'[T]his practical and common-sensical standard' is based on 'the totality of the circumstances.'" *United States v. Zamora-Garcia*, 831 F.3d 979, 983 (8th Cir. 2016) (alteration in original) (quoting *Florida v. Harris*, 568 U.S. 237, 244 (2013)).

It is not this Court's place to determine whether affidavits supporting search warrants are supported by probable cause. "[A]fter-the-fact scrutiny by courts of the sufficiency of an affidavit should not take the form of *de novo* review. A magistrate's determination of probable cause should be paid great deference by reviewing courts." *Gates*, 462 U.S. at 236 (citation and internal quotation marks omitted); *see also United States v. Hallam*, 407 F.3d 942, 948 (8th Cir. 2005) ("In reviewing the issuance of a warrant, a district court need not make a *de novo* inquiry into the existence of probable cause."). "The Fourth Amendment requires that the issuing 'magistrate had a substantial basis for concluding that a search would uncover evidence of wrongdoing.'" *United States v. Maccani*, 49 F.4th 1126, 1130 (8th Cir. 2022) (quoting *Gates*, 462 U.S. at 236); *see also United States v. Johnson*, 848 F.3d 872, 876 (8th Cir. 2017) ("The role of a reviewing court is to ensure the magistrate issuing the warrant 'had a "substantial basis for concluding that probable cause existed"'") (quoting *United States v. Colbert*, 828 F.3d 718, 726 (8th Cir. 2016), in turn quoting *United States v. Garcia-Hernandez*, 682 F.3d 767, 771 (8th Cir. 2012))). "When the issuing magistrate relies solely on a supporting affidavit in determining probable cause, . . . 'only that information which is found within the four corners of the affidavit may be considered in determining the existence of probable cause.'" *United States v. Saddler*, 19 F.4th 1035, 1039 (8th Cir. 2021) (quoting *United States v. Roberts*, 975 F.3d 709, 713 (8th Cir. 2020)).

"The issuing court's probable cause determination 'should be paid great deference by reviewing courts.'" *Johnson*, 848 F.3d at 876 (quoting *United States v. Brewer*, 588 F.3d 1165, 1170 (8th Cir. 2009)).

The substantial basis standard requires that the issuing judge "make a practical and common-sense" determination, based only on the circumstances set forth in the affidavit, that the totality of the circumstances point to "a fair probability that contraband or evidence of a crime will be found in a particular place." *United States v. Kail*, 804 F.2d 441, 444 (8th Cir. 1986) (quoting *Gates*, 462 U.S. at 238). "Not only may an issuing judge 'draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant, . . . law enforcement officers may make reasonable inferences in preparing affidavits in support of a warrant.'" *United States v. Brackett*, 846 F.3d 987, 992 (8th Cir. 2017) (quoting *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir. 2000)). "[T]here is no requirement that an affiant have first-hand knowledge of every allegation he includes in his affidavit." *United States v. Fiorito*, 640 F.3d 338, 346 (8th Cir. 2011). Conclusory statements, however, "made by affiants fail to give the issuing magistrate a substantial basis for determining probable cause exists." *United States v. Summage*, 481 F.3d 1075, 1077-78 (8th Cir. 2007). "In addition to probable cause that contraband or evidence of a crime will be found, 'there must [also] be evidence of a nexus between the contraband and the place to be searched.'" *United States v. Randle*, 39 F.4th 533, 536 (8th Cir. 2022) (quoting *United States v. Tellez*, 217 F.3d 547, 550 (8th Cir. 2000)). This requires "'a "nexus" between the evidence to be seized and the place to be searched, considering "the nature of the crime and the reasonable, logical likelihood of finding useful evidence."'" *Schave*, 55 F.4th at 676 (quoting *United States v. Smith*, 21 F.4th 510, 515 (8th Cir. 2021), in turn quoting *United States v. Johnson*, 848 F.3d 872, 878 (8th Cir. 2017)).

11

Defendant bears the burden of proving the warrant was issued without probable cause. *See Carter v. United States*, 729 F.2d 935, 940 (8th Cir. 1984) ("As a general rule, the burden of proof is on the defendant who seeks to suppress evidence") (citing *United States v. Phillips*, 540 F.2d 319 (8th Cir. 1976)); *United States v. McGuire*, No. CR 13-40058, 2013 WL 5516192, at *3 (D.S.D. Oct. 1, 2013) ("A movant seeking to suppress evidence under a regularly issued warrant has the burden to show that the warrant was issued without probable cause") (quoting *United States v. Sierra–Garcia,* 760 F. Supp. 252, 262 (E.D.N.Y. 1991)), *R. & R. adopted,* 2013 WL 6449893 (D.S.D. Dec. 10, 2013). "In doubtful or marginal cases, the resolution of the Fourth Amendment question should be determined to a large extent by the preference accorded to searches based upon warrants." *United States v. Leichtling*, 684 F.2d 553, 555 (8th Cir. 1982) (quoting *United States v. Christenson*, 549 F.2d 53, 55 (8th Cir. 1977)); *see also United States v. Ventresca*, 380 U.S. 102, 109 (1965) ("Although in a particular case it may not be easy to determine when an affidavit demonstrates the existence of probable cause, the resolution of doubtful or marginal cases in this area should be largely determined by the preference to be accorded to warrants.").

C.    *Analysis*

1.    *Was there probable cause for the search warrant for the University Avenue residence?*

The application expressly requested permission to search the University Avenue residence for controlled substances, drug paraphernalia, records relating to the distribution of controlled substances, and firearms, ammunition, and explosive devices. Inv. Leitzen checked that these items are "property which has been obtained in violation of the law," "property which is illegally possessed," "property used or possessed with the intent to be used as a means of committing a public offense or concealed to prevent

12

an offense from being discovered," and "property relevant and material as evidence in a criminal prosecution." In summary, the affidavit sets forth the following:

a. Over several years, law enforcement had received information from multiple sources that Defendant was involved in selling drugs in Dubuque and Defendant possessed firearms.

b. In June 2025, Inv. Leitzen received information from a CS that Defendant lived with H.B. at the University Avenue residence and drove H.B.'s vehicle.

c. The CS also told Inv. Leitzen that Defendant was involved in drug distribution and possessed a handgun. Additionally, the CS stated that H.B. was also involved with Defendant in selling drugs.

d. In June 2025, a CI informed Inv. Leitzen that regularly bought cocaine from Jordan Hefel, who was the middleman for the CI's drug purchases. The CI explained that he would contact Hefel, Hefel would contact his supplier, and then set up a drug deal in a public place. The CI stated that he, Hefel, and the drug supplier would arrive at the agreed upon place in separate vehicles. Hefel would retrieve the cocaine from the drug supplier, bring the cocaine to the CI, the CI would give Hefel money for the cocaine, and Hefel would give the money to the drug supplier.

e. In June 2025, law enforcement, using the CI, had the CI set up a controlled drug purchase involving the CI, Hefel, and the drug supplier. The parties arrived at the agreed upon meeting place in separate vehicles, including Defendant with H.B. in H.B.'s vehicle. Defendant was sitting in the passenger seat and Inv. Leitzen, who was surveilling the controlled by identified Defendant.

13

f.  During the controlled drug purchase, Defendant gave Hefel a bag containing cocaine, Hefel gave the bag to the CI, the CI gave Hefel money, and Hefel gave the money to Defendant.

g.  Law enforcement followed Defendant after the controlled purchase and a short stop at a store, the Defendant returned to the University Avenue residence.

h.  After the controlled buy, Inv. Leitzen showed the CI a photo lineup of six different subjects resembling Defendant and the CI was able to positively identify Defendant as the drug supplier.

i.  Law enforcement reviewed Dubuque traffic cameras from the timeframe of the controlled drug purchase and observed H.B.'s vehicle leaving the parking lot for the University Avenue residence and a short time later arriving at the agree-upon meeting place.

j.  Using license plate readers for H.B.'s vehicle, Investigator Leitzen learned that on June 19, 2025, H.B.'s vehicle left Dubuque at 6:47 am went to Chicago and returned to Dubuque at 2:20 p.m., meaning the vehicle was in Chicago for about an hour. Earlier in June H.B.'s vehicle also made two short trips to Chicago (7 hours and 10 minutes and less than 6 hours, respectively).

k.  On June 20, 2025, Inv. Leitzen applied for and received a warrant allowing him to affix a GPS mobile tracking device to H.B.'s vehicle. On June 25, 2025, the vehicle, driven by H.B., left Dubuque at 6:03 a.m., arrived in Posen, IL, a town south of Chicago, at 9:51 a.m., and began heading back to Dubuque at 10:20 a.m.

14

l.  Inv. Leitzen stated: "I know based on my training and experience . . . that short-term trips to source cities are indicative of someone making that trip for the purpose of acquiring drugs. I know that it is extremely uncommon for someone to make a six and one half hour round trip in a vehicle for a social visit which lasts less than thirty minutes. I believe the likelihood that [H.B.] acquired a large quantity of drugs in Chicago to transport back to Dubuque for resale is very high."

m.  Inv. Leitzen also stated that, based on his training and experience, he knows that individuals involved in drug distribution "often acquire the drugs in bulk amounts" and "then break the bulk quantities of drugs down into smaller, personal use amounts which are then sold to drug users for a profit.

n.  Further, Inv. Leitzen stated: "I am also aware that drug dealers often keep bulk quantities of drugs at their residence. The drug dealers often meet drug customers at a location away from their residence in order to sell them a small quantity of drugs for a profit. Drug dealers typically only bring a relatively small quantity of drugs from their residence to the meeting location to help protect them from having the drugs being stolen by drug users or rival drug dealers. It also helps protect the drug dealers from being captured by law enforcement and having all of their drugs seized."

o.  Lastly, Inv. Leitzen stated: "Based on the facts gathered during this investigation, I believe there will likely be cocaine, marijuana, drug paraphernalia, packaging material, firearms, and possibly other drugs inside the residence of [XXXX] University Avenue[.]"

15

(Def. Ex. B)

Defendant is correct that the "affidavit does not allege that any drug deals took place at the residence, nor does it provide any information from sources that anyone was keeping drugs at the residence." However, this is not a case where the conclusion that controlled substances may be found at a dealer's residence is based solely on Inv. Leitzen's training and experience – although his affidavit certainly includes such information. Here, there is plausible information that Defendant and his significant other are involved in drug trafficking. More specifically, Defendant is seen leaving his residence immediately before the controlled buy and he returns to it soon afterward. It is not unreasonable to infer that a known drug supplier, who had a history of taking multiple short trips to a source city in June 2025 (the month pertinent to this investigation), and who left his residence and directly proceeded to the location of a controlled drug purchase would have drugs at his residence. Judges "may draw reasonable inferences from the totality of the circumstances in determining whether probable cause exists to issue a warrant." *United States v. Thompson*, 210 F.3d 855, 860 (8th Cir.2000). Moreover, Inv. Leitzen also opined that based on his training and experience that such facts along with the other facts outlined in the affidavit were consistent with drug suppliers keeping drugs in their residence. Obviously, the affidavit need not establish Defendant's guilt beyond a reasonable doubt, only probable cause to believe that contraband or evidence of a crime would be found at the University Avenue residence.

Defendant's concern that the application "provided no reason to believe that police would find 'straws, mirrors, hypodermic syringes, razor blades, cotton, spoons, aluminum foil, cutting agents, scales, and any other material associated with the processing and packaging of illicit drug sales and/or use'" is misplaced. (Doc. 34-1 at 7.) Preceding the language quoted by Defendant in the application, it states that the

16

property to be seized is "[a]ny and all drug paraphernalia consisting in part of and including but not limited to." As discussed above, based on the totality of the information in the affidavit, including that Defendant is a known drug supplier and distributor, it is not an unreasonable inference that drug paraphernalia would be found at the University Avenue residence. The fact that the application lists examples of drug paraphernalia, "but not limited" to those examples, does not defeat probable cause for the issuance of the search warrant.

Finally, at the hearing, Defendant introduced Defendant's Exhibit E, which was admitted over objection. Defendant's Exhibit E contains various records showing that Defendant has legitimate ties to Chicago. The fact that Defendant can offer legitimate reasons to visit Chicago does not mean the Court cannot consider also the information in the search warrant application or affidavit which tends to suggest criminal behavior in assessing probable cause. Probable cause is determined by looking solely at the four corners of the affidavit. *See Saddler*, 19 F.4th at 1039. Moreover, common sense supports Inv. Leitzen observation detailed in the affidavit that, based on his training and experience, individuals generally do not make a 6.5-hour round trip to a source city and only spend an hour or less in that source city multiple times in a month, especially if that individual was visiting relatives.

Accordingly, based on the totality of the circumstances outlined above, and paying great deference to the issuing court's probable cause determination in the search warrant, I find that the issuing judge had a substantial basis for concluding that probable cause existed and that there was a fair probability that contraband or evidence of a crime would be found at the University Avenue residence. *See Reed*, 921 F.3d at 757; *Johnson*, 848 F.3d at 876; *Kail*, 804 F.2d at 444. I also find that the requisite "nexus" between the evidence to be seized and the place to be searched was established in the search warrant. *See Schave*, 55 F.4th at 676. Thus, I find that there was probable cause for the June 25,

17

2025 search warrant for the University Avenue residence, Defendant's Exhibit B. Therefore, I recommend that the motion to suppress be denied.

### 2. Is the Leon good faith exception applicable?

Alternatively, if the Court determines that the search warrant for the University Avenue residence lacked probable cause, the *Leon* good faith exception should be applied to make the evidence inadmissible.

Under the good faith exception articulated in *United States v. Leon*, even if a reviewing court determines substantial evidence to issue a warrant is absent, the court should not suppress evidence seized pursuant to the search warrant if the officers executing the search warrant acted in objectively reasonable reliance on the issuance of the warrant by a neutral magistrate or judge. 468 U.S. 897, 922 (1984); *United States v. Houston*, 665 F.3d 991, 994-95 (8th Cir. 2012). "In making this determination, we ask 'whether a reasonably well-trained officer would have known that the search was illegal despite a judge's issuance of the warrant.'" *United States v. Lopez-Zuniga*, 909 F.3d 906, 909 (8th Cir. 2018) (quoting *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015)).

Under the "good-faith exception," if a law enforcement officer's reliance on a warrant was objectively reasonable, the evidence seized pursuant to an invalid warrant will not be suppressed. *United States v. Proell*, 485 F.3d 427, 430 (8th Cir. 2007). *Proell* noted that *Leon* identified four scenarios where it is not objectively reasonable for the executing officer to rely on a warrant issued by a magistrate:

> (1) when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge; (2) when the issuing judge "wholly abandoned his judicial role" in issuing the warrant; (3) when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and (4)

when the warrant is "so facially deficient" that no police officer could reasonably presume the warrant to be valid.

*Id*. at 431 (citing *Leon*, 468 U.S. at 923; *United States v. Puckett*, 466 F.3d 626, 630 (8th Cir. 2006)).

*Leon* explained that "[s]earches pursuant to a warrant will rarely require any deep inquiry into reasonableness, for a warrant issued by a judge normally suffices to establish that a law enforcement officer has acted in good faith in conducting the search." 468 U.S. at 922 (quotations omitted). Nevertheless, "in some circumstances the officer will have no reasonable grounds for believing that the warrant was properly issued." *Id*. at 922-23 (footnote omitted). "For the *Leon* exception to apply when the warrant is based on evidence obtained through a Fourth Amendment violation, [law enforcement's] prewarrant conduct must have been 'close enough to the line of validity to make the officers' belief in the validity of the warrant objectively reasonable.'" *United States v. Cannon*, 703 F.3d 407, 413 (8th Cir. 2013) (quoting *United States v. Conner*, 127 F.3d 663, 667 (8th Cir. 1997)). If the prewarrant conduct is clearly illegal, however, the exception does not apply. *Cannon*, 127 F.3d at 413.

None of the four scenarios contemplated by *Leon* apply here. There is no evidence that the affidavit in support of the search warrant contained any false statements or that the issuing magistrate judge was misled in any way. Contrary to Defendant's assertion, here is no evidence that the issuing magistrate judge "wholly abandoned" his or her judicial role in issuing the search warrant. As discussed above, the judge made common sense and reasonable inferences based on the totality of the circumstances in finding that the search warrant application and affidavit were supported by probable cause. See *Kail*, 804 F.2d at 444; *Thompson*, 210 F.3d at 860. Also, contrary to Defendant's contentions, and as discussed above, based on the affidavit in support of the warrant application, the issuing judge had a substantial basis and made "a practical and common-sense"

19

determination, based on the totality of the circumstances, that "a search would uncover evidence of wrongdoing" and/or contraband; and therefore, the affidavit was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *See Kail*, 804 F.2d at 444; *Maccani*, 49 F.4th at 1130; *Proell*, 485 F.3d at 431. Finally, there is no allegation or evidence that the warrant is "so facially deficient" that a police officer could not reasonably presume that the warrant was valid.[5] Thus, I find that law enforcement's conduct was close enough to the line of validity to justify law enforcement's belief that the search warrant was objectively reasonable. *See id*. Accordingly, as an alternative, I recommend that Defendant's motion to suppress be denied under the *Leon* good faith exception.

## IV.    CONCLUSION

For the reasons set forth above, I respectfully recommend the District Court **deny** Defendant's Motion to Suppress. **(Doc. 34.)**

Objections to this Report and Recommendation in accordance with 28 U.S.C. Section 636(b)(l) and Fed. R. Crim. P. 59(b) must be filed within fourteen (14) days of the service of a copy of this Report and Recommendation. Objections must specify the parts of the Report and Recommendation to which objections are made, as well as the parts of the record forming the basis for the objections. *See* Fed. R. Crim. P. 59. Failure to object to the Report and Recommendation waives the right to *de novo* review by the district court of any portion of the Report and Recommendation as well as the right to appeal from the findings of fact contained therein. *United States v. Wise,* 588 F.3d 531, 537 n.5 (8th Cir. 2009).

---

[5] In his brief, Defendant argues that the warrants for the cell phones, which are not at issue here, were "facially deficient," but he does not make that argument with regard to the instant search warrant for the University Avenue residence.

**DONE AND ENTERED** at Cedar Rapids, Iowa, this 13th day of January, 2026.

Mark A. Roberts, United States Magistrate Judge
Northern District of Iowa